[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 03, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-12119

_____

D.C. Docket No. 03-00163 CV-F-N

LEROY SMITH,

Plaintiff-Appellant,

versus

GWENDOLYN MOSLEY,
KENNETH JONES,
KENNETH SCONYERS,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(July 3, 2008)**

Before TJOFLAT, ANDERSON and COX, Circuit Judges.

TJOFLAT, Circuit Judge:

In this case, an Alabama prison inmate serving a life sentence for murder

seeks legal and equitable relief against the prison's warden, assistant warden, and hearing review officer under 42 U.S.C. § 1983[1] on the ground that they retaliated against him for engaging in protected speech – for complaining to the assistant warden and the U.S. Department of Justice about conditions of confinement at the prison. The district court granted the defendants summary judgment, and the inmate has appealed. We affirm.

## I.

## A.

The inmate is LeRoy Smith. At the time of the events giving rise to this law suit, Smith was confined in the Easterling Correctional Facility in Clio, Alabama.[2] On or about Friday, January 3, 2003, Smith sent the following type-written letter to Assistant Warden Kenneth Jones complaining about past and present conditions

---

[1] Section 1983 states, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . for redress.

42 U.S.C. § 1983.

[2] Smith is presently confined in the Bibb County Correctional Facility in Brent, Alabama.

of his confinement at Easterling:[3]

Re: Mandatory Yard Call

Warden Jones,
this is a follow-up letter to the request that I sent you on Dec. 3, 2002.
Having got no response to the request comes as no real surprise to me
because I'm well aware of this Institution and it's habit of
disregarding anything brought to the attention of it's Administrators
by an inmate.

In case you're not familiar with the "practice" I'm referring to,
it's the act of forcing the inmates to leave the warm dorm and go
outside in thirty-something degree temperatures, wearing
sub-standard clothing, with no shelter from the winter-like conditions.

It should come as no surprise to you that the practice is, at the
very least, being arbitrarily, and maliciously applied to the segment of
the prison population that can ill afford it. People with compromised
immune systems, that makes them easy candidates to contract
pneumonia. A threat, not only to their health, but to their lives also.

To be forced outside in weather conditions that we are being
subject to amounts to pre-meditated assault because any person of
reasonable intelligence knows the likely consequences of our being
subjected to such non-sense. Maybe you should be forced to stand
around outside, unsheltered, in thirty-eight degrees, with a 10-15
MPH breeze blowing. See how you'd like it.

Maybe there exist some sinister motive behind the practice? A
powerful argument can be made that it is being done to get more
people to sign up for sick-call so they will have to pay the $3.00
co-pay thereby increasing the institutions coffers underneath the
MISC. INCOME category. Or maybe some other motive exist, one
that is not so readily apparent. Like that fiasco in 1999, where the
administrative heads of this institution decided to "vaccinate"
everyone in this institution against the venereal disease syphilis.
Anyone with a brain knows that no such thing as syphilis vaccine

---

[3] The text of the letter indicated that copies were being sent to the "Commissioner of
Corrections, the Attorney General, and the United States Justice Department."

exists. And to top it all off, more than twelve hundred were then treated without ever being tested for the disease!

What is the true motive behind the madness? If I got sick to the point of dying, would it matter? Or is that the general idea? It's a really good way to limit the population in the prisons! Maybe this is just part of the big picture. With the way we are being treated, this institution should forever be branded a test-bed for human experimentation, physically as well as psychologically. Remember the infamous Tuskegee Study?

And while we are on the subject of health, let me make another relevant observation. I can certainly understand why there is a shortage of officers here at Easterling. The majority of those here are too busy practicing medicine to be officers, telling the inmates what they should and should not eat to stay healthy. This is quite a stretch for people who can't count to one-hundred without screwing it up! Excuse me, maybe I'm the one who is wrong and the Dept. of Corr. really is providing it's guards with a back-up course in medical technology!

But let's just forget about the fact that I was held down by four officers and forcibly injected with a "syphilis vaccine"; forget about the fact that I'm being forced to go outside in foul weather conditions, dressed in sub-standard clothing, where, because of my diabetic condition, I have a weakened immune system making me subject to the life threatening condition of pneumonia; and last, but certainly, by no means least, lets just forget about the physical and psychological manipulations being done at this prison facility. The underlying question is where will it all end? On a more sinister level, when, if ever, will it end? How can the inhumanity we are being subjected to be justified? As you can see, I have some serious questions that needs answers. For instance; why am I being fed a diet composed of 95% starch when you know I am diabetic? Why am I forced to attend a "progress review hearing" only to be told that I cannot make any progress?

Why am I being denied certain privileges because my supervisor failed to do the job he is being paid to do. Better yet, why is it my responsibility to remind him to do his job?

These are just some of the questions I ask now and before that I

4

have yet to get answers to. Needless to say, I'll continue to ask these questions and I'm going on record yet again as having asked these questions.

In closing, as always, I'll say again, thanks for your time.

Respectfully,
LeRoy Smith – #107551

Jones received the letter at 10:30 a.m. on January 3. After reading the letter, Jones concluded that part of what Smith stated in the letter may have constituted the violation of two of the "Major Rules" of Alabama Department of Corrections ("DOC") Administrative Regulation 403: Rule 41, "Making False Statements or Charge to a DOC Employee with Intent to Deceive the Employee or to Prejudice Another Person"; and Rule 57, "Insubordination."[4] Jones therefore prepared an "Institutional Incident Report" and submitted it to his supervisor, Warden Gwendolyn Mosley. After meeting with Mosley, Jones had Smith brought to the prison's administrative inmate waiting area and asked him whether he had sent the letter. When Smith admitted sending the letter, Jones informed him that disciplinary hearings would be convened for the purpose of determining whether he had violated Rules 41 and 57 and, if he had done so, whether he should be

---

[4] Regulation 403 contains a section headed: "DEFINITIONS AND EXAMPLES OF RULE VIOLATIONS." The definition and examples for Major Rule 41 are: "MAKING FALSE STATEMENTS OR CHARGES – The speaking of slanderous, defamatory, or untrue words tending to prejudice another." The definition and examples for Major Rule 57 are: "INSUBORDINATION – Any act, gesture, remark or statement which obviously reflects disrespect to lawful authority."

disciplined. Jones then assigned Smith to the restricted privileges dorm pending the disciplinary proceedings.

Jones prepared a "Disciplinary Report"[5] for each alleged violation, and Warden Mosley, as required by Administrative Regulation 403, designated a member of the prison staff, Corrections Officer Bill Davis, to preside over the disciplinary hearings.[6] The first disciplinary report cited Smith with violating Rule 57, "Insubordination," and, as indicated in the margin, related the "[c]ircumstances of the violation."[7] The second report cited Smith with violating

---

[5] The disciplinary report was made out on "DOC Form 225B (Revised 7/92)." The form served several purposes. First, it contained charging officer's statement – in this case made by Jones – informing the inmate of the (Administrative Regulation 403) Rule violation, the date of occurrence, and, as indicated in the text following this footnote, the "[c]ircumstances of the violation(s)." Second, it contained the hearing officer's notification of the date, time, and place of the hearing on the charging officer's allegations. The inmate signed an acknowledgment indicating that he had received the charging officer's statement and the hearing officer's notification of the time and place of the hearing.

The form thereafter served as the format for the hearing. It recorded the inmate's plea to the charging officer's allegations, guilty or not guilty; the charging officer's testimony; the inmate's testimony; the hearing officer's findings as to whether the allegations constituted a violation of the cited rule; and, if the hearing officer found against the inmate, the officer's recommended sanction.

[6] Administrative Regulation 403 section III.B provides as follows:

Wardens will appoint a Department of Corrections employee to serve as Hearing Officer of any charge(s) brought against an inmate pursuant to AR 403. Wardens, personnel who have formed an opinion of the innocence or guilt of the charged inmate, Arresting Officer, and witnesses may not serve as Hearing Officer.

[7] The report stated as follows:

On January 3, 2003, at approximately 10:30 AM, Warden Kenneth Jones received correspondence from Inmate Leroy Smith, B/107551, addressed to Warden Jones,

6

Rule 41, "Making False Statements or Charges to a DOC Employee with Intent to Deceive the Employee or to Prejudice Another Person," and, as indicated in the margin, related the "[c]ircumstances of the violation."[8]  The reports were served on Smith the same day, June 3.  The reports informed him that the charges would be heard in separate hearings on January 7, beginning at 3:05 p.m.

The hearings were held on January 7, as scheduled.  Jones and Smith both appeared.  The first hearing dealt with the alleged violation of Rule 41, Smith's allegedly false statement, "Like that fiasco in 1999, where the administrative heads of this institution decided to 'vaccinate' everyone in this institution against the venereal disease syphilis."  Smith pled not guilty to the charge that the statement was false and then testified.  Admitting that he had made a "bad choice of words," he insisted that the statement was not false because the inoculations for syphilis

with an indication that copies were sent to the Commissioner, Attorney General, and US Department of Justice.  The correspondence contained insubordinate statements such as, "Maybe you should be forced to stand around outside, unsheltered, in thirty-eight degrees, with a 10-15 MPH breeze blowing.  See how you'd like it."

[8] The report stated as follows:

On January 3, 2003, at approximately 10:30 AM, Warden Kenneth Jones received correspondence from Inmate Leroy Smith, B/107551, addressed to Warden Jones, with an indication that copies were sent to the Commissioner, Attorney General, and US Department of Justice.  The correspondence contained false charges such as, "Like that fiasco in 1999, where the administrative heads of this institution decided to 'vaccinate' everyone in this institution against the venereal disease syphilis."

had actually taken place.[9]  Jones testified that the inoculations had been given at the direction of Alabama Department of Health, and that Smith's allegation that they had been given at the direction of the prison's administration was false and, furthermore, obviously intended to prejudice those responsible for the prison's operation, especially since Smith had sent the letter to the U.S. Department of Justice.  At the conclusion of the hearing, Officer Davis found that the statement at issue was false.  As a sanction, he recommended forty-five days of disciplinary segregation and the loss of store, telephone, and visiting privileges.

At the hearing involving the Rule 57 violation, Smith pled guilty to the charge.  He also testified, explaining, as he had at the previous hearing, that he had used a "bad choice of words."  As a sanction, Davis recommended forty-five days in the "hot dorm" and a loss of all privileges.[10]

Administrative Regulation 403 provides that the hearing officer's findings and recommendation are to be reviewed by the Warden or the Warden's designee.[11]  Warden Mosley designated Lt. Kenneth Sconyers to serve as the

---

[9]  Smith also said that the statement could not have "prejudiced" Jones because he was not employed at the prison at the time the inoculations were administered.

[10]  The "hot dorm" and disciplinary segregation appear to have been the same.  In any event, whether they were or not is not pertinent to this appeal.

[11]  Administrative Regulation 403 section V.F provides that the "Warden or his/her designee will approve or disapprove the findings and/or recommendations within ten (10)

review officer.  On January 9, Sconyers issued his decisions; he approved Officer Davis's findings and recommendations.

## B.

On February 11, 2003, Smith filed this law suit against Mosley, Jones, and Sconyers under 42 U.S.C. § 1983, alleging that they conspired to, and subsequently did, discipline him without affording him the due process or equal protection rights guaranteed by the Fourteenth Amendment.  As relief, Smith requested that the disciplinary proceedings be declared void and sought compensatory and punitive damages.  Smith later amended his complaint to add a claim that the three defendants commenced the disciplinary hearing in retaliation against him for exercising his First Amendment right of free speech.[12]

On April 30, 2003, the district court dismissed Smith's due process and equal protection claims with prejudice,[13] but it did not address Smith's retaliation claim.  The court dismissed Smith's retaliation claim on summary judgment on

working days after hearing."

[12]  Smith did not claim that Davis conspired with Jones, Mosley, and Sconyers to retaliate against him for exercising his right of free speech.

[13]  Although the court did not explicitly consider Smith's due process claim as having been brought under the procedural component of the Fourteenth Amendment's Due Process Clause, we read the court's dispositive order, which was based on a magistrate judge's report and recommendation, to have found that the procedures involved in the handling of the alleged violations of Rules 41 and 57 satisfied all applicable due process requirements.  The court denied Smith's equal protection claim because Smith had not alleged an equal protection violation.

9

March 22, 2006, and entered final judgment for the defendants on all claims the same day. Smith now appeals, challenging the court's disposition of his retaliation claim, but not his due process and equal protection claims.[14]

## II.

## A.

It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement. See, e.g., Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003). It is also established that an inmate may maintain a cause of action against prison administrators who retaliate against him for making such complaints. Id.[15] To prevail, the inmate must establish these elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. See Bennett

---

[14] Smith litigated his case pro se in the district court. On appeal, he has been represented by counsel appointed by this court.

[15] See also Boxer X v. Harris, 437 F.3d 1107, 1112 (11th Cir. 2006) ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment.").

v. Hendrix, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005).[16]

We consider Smith's letter to Assistant Warden Jones to have been an exercise in speech. The speech consisted of, for our purposes, two grievances[17] and the statements on which Jones based his allegations that Smith had violated Rules 41 and 57 of Administrative Regulation 403 – statements that Smith admitted were a "bad choice of words." The grievances were: (1) inmates, like Smith, who have "compromised immune systems" and are susceptible to "pneumonia," are forced to "leave the warm dorm . . . go outside in thirty-something degree temperatures, wearing substandard clothing, with no shelter from the winter-like conditions," and (2) Smith was "being fed a diet composed of 95% starch when [Jones] knows that [he] is a diabetic." These two grievances

---

[16] Bennett v. Hendrix, 423 F.3d 1247 (11th Cir. 2005), was not a prisoner retaliation case; rather, it involved retaliation claims brought by citizens against a sheriff for interfering with their support of a referendum, a First Amendment activity. Bennett found the elements of the citizens' retaliation claim in, among other cases, Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005), and Thaddeus-X v. Blatter, 175 F.3d 378, 396 (6th Cir. 1999), which involved a claim that prison administrators had retaliated against an inmate for engaging in First Amendment activity. 423 F.3d at 1250-51. Davis v. United States, No. 07-14639, 2008 U.S. App. Lexis 7957 (11th Cir. Apr. 8, 2008) (unpublished), thereafter drew on Bennett for the elements of a claim that prison administrators had retaliated against an inmate because of the inmate's speech. These elements, as set out in the above text, are implicit in prisoner retaliation cases decided prior to Davis. See, e.g., Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003).

[17] Smith did not formally invoke the DOC's grievance procedures and has not contended that he did. We nonetheless treat his letter as presenting the two grievances described in the text because it is apparent that he wanted Assistant Warden Jones to afford some relief for his fellow inmates and, in particular, for him.

constituted protected speech.

The Rule 41 charge was based on the false statement that the prison administration needlessly decided to vaccinate all prisoners (including Smith) for syphilis in 1999. The Rule 57 charge was based on these statements: "Maybe you should be forced to stand around outside, unsheltered, in thirty-eight degrees, with a 10-15 MPH breeze blowing. See how you'd like it." According to his testimony before hearing officer Davis, Jones considered other statements as acts of insubordination as well: "What is the true motive behind the madness? If I get sick to the point of dying, would it matter? Or is that the general idea? It's a really good way to limit the population in the prisons! . . . With the way we are being treated, this institution should forever be branded a test-bed for human experimentation . . . . Remember the infamous Tuskegee Study?"[18] Whether these statements, which were found to be false and insubordinate, should have received First Amendment protection is problematical. The answer depends on whether Rules 41 and 57 amounted to valid limitations on the exercise of speech.

B.

---

[18] If the hearings before Officer Davis were transcribed, the transcripts were not presented to the district court and made part of the record. The record does indicate, however, that Jones told Davis that the letter contained several statements that he viewed as insubordination.

"Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources." Turner v. Safley, 482 U.S. 78, 84-5, 107 S. Ct. 2254, 2259, 96 L. Ed. 2d 64 (1987). Prison officials are therefore "accorded latitude in the administration of prison affairs." Cruz v. Beto, 405 U.S. 319, 321, 92 S. Ct. 1079, 1081, 31 L. Ed. 2d 263 (1972). This latitude includes "the withdrawal or limitation of many [inmate] privileges and rights." Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 (1974) (quotation marks and citation omitted). This means that an inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's "status as a prisoner or with the legitimate penological objectives of the corrections system." Id.

Rules 41 and 57 are reasonably related to legitimate penological interests and therefore valid limitations on inmate speech.[19] Smith's false and insubordinate remarks fell within the rules' proscriptions and, accordingly, were not protected. As the court in Thaddeus-X stated, "if a prisoner violates a legitimate prison regulation, he is not engaged in 'protected conduct,' and cannot proceed beyond step one." 175 F.3d at 395. In short, Smith's false and

---

[19] Smith has not contended to the contrary. Moreover, he has not claimed that the rules are unconstitutional on their face or could not validly apply to the speech Jones cited in the disciplinary reports alleging violations of Rules 41 and 57.

insubordinate remarks failed to establish the first element of a retaliation claim.

Accordingly, to prevail on a claim for retaliation, and to resist summary judgment, Smith had to rely on the argument that the defendants retaliated against him for presenting the two grievances we cited above. He satisfied the claim's first element, as the grievances amounted to protected speech, so the question becomes whether the evidence supported the second and third elements, as set out in Bennett. The second element required Smith to show that the discipline he received "would likely deter a [prisoner] of ordinary firmness" from complaining about the conditions of his confinement. Bennett, 423 F.3d at 1254. Whether the discipline "would likely deter" presents an objective standard and a factual inquiry. We conclude that, in this case, the standard was met. Whether Smith presented enough to withstand summary judgment thus depends on whether he satisfied Bennett's third element, causation – a causal connection between his constitutionally protected speech and the discipline he received.

C.

The causal connection inquiry asks whether the defendants were subjectively motivated to discipline because Smith complained of some of the conditions of his confinement. Thaddeus-X, 175 F.3d at 399. Specifically, what motivated Jones to prepare the "Incident Report" and submit it to Mosley? What

14

motivated Mosley to authorize Jones to file the rule-violation charges?  What

motivated Sconyers to affirm Davis's decisions recommending the discipline?[20]

And, finally, what motivated Mosley to adopt the recommendation and put it into

effect?

As the Thaddeus-X court noted, most courts resolve this subjective

motivation issue under the Mt. Healthy burden-shifting formula.[21]  Id. at 399 n.14.

See generally Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 97

S. Ct. 568, 50 L. Ed. 2d 471 (1977).  At a trial held under the Mt. Healthy formula,

> [o]nce the plaintiff has met his burden of establishing that his
> protected conduct was a motivating factor behind any harm, the
> burden of production shifts to the defendant.  If the defendant can
> show that he would have taken the same action in the absence of the
> protected activity, he is entitled to prevail on [his motion for
> judgment as a matter of law or prior to trial on] summary judgment.

Thaddeus-X, 175 F.3d at 399 (citation omitted).[22]

--------

[20]  Note that Smith did not sue Davis – probably because he was just doing his job.  But that would seem to be the case with Sconyers as well.  Both were appointed by Mosley – Davis to handle the hearing, Sconyers to review Davis's decision.

[21]  Smith contends that, in granting the defendants' summary judgment on his retaliation claim, the district court erred because it resolved the subjective motivation issue under the burden-shifting formula articulated in Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981), rather than the Mt. Healthy formula. Assuming arguendo that Smith is correct, it is of no moment because Smith's case fails under Mt. Healthy.

[22]  Under the Mt. Healthy approach, if the government official "can prove that [he] would have taken the adverse action in the absence of the plaintiff's protected conduct, [he] cannot be held liable." Thaddeus-X, 175 F.3d at 388 n.4 (citing decisions of the First, Second, Fifth, and

Whether a reasonable jury could find that Smith's grievances were the motivating factor behind the defendants' actions is a close question. Smith introduced no direct evidence that they were, and there is nothing in his responses to Jones's allegations that even suggests that he thought the charges were a mere pretext – that they had been brought in retaliation for his grievances.[23] He pled guilty to the insubordination charge, and he attempted to evade the false statement charge by saying that Jones was not at the prison when, in 1999, the inmates were inoculated for syphilis and therefore could not have considered the false statement as having been directed to him.[24] As for Sconyers, his role was limited to reviewing Davis's decision; he had played no role in the decision to prosecute Smith for the rule violations.[25]

We assume without deciding that a reasonable fact finder could infer from the circumstances, taken as a whole, that the letter's presentation of the grievances was a motivating factor in Mosley and Jones's decision to go forward with the charges. Because the record had been closed by the time the district court

Seventh Circuits).

[23] Smith's responses made no mention of his grievances.

[24] Therefore, Smith contended, the false statement about the inoculations could not have implicated Jones, or, as in the definition of Rule 41, tended to "prejudice" him.

[25] It is obvious that the retaliation claim against Sconyers is meritless. Our remaining discussion relates only to Mosley and Jones.

16

addressed the defendants' motion for summary judgment, the question for the court under Mt. Healthy became whether a reasonable fact finder, a jury, would have to find that the defendants would have disciplined Smith "even in the absence of the protected conduct," i.e., the submission of grievances. Mt. Healthy, 429 U.S. at 287, 97 S. Ct. at 576; Thaddeus-X, 175 F.3d at 388 n.4. For us, the answer to that question is clear; Mosley and Jones would have proceeded as they did – to charge Smith with violations of Rules 41 and 57 – even if his letter had not contained what appeared to be legitimate grievances. Objective prison administrators standing in Mosley and Jones's shoes would assume that the gist of what Smith said in his letter, and the language he employed, which reeked of disrespect for the administrators' authority, would be noised about the prison's population and, if ignored, could seriously impede their ability to maintain order and thus achieve the institution's penological objectives.

The judgment of the district court is

AFFIRMED.