**Tommy Lee BENTON, Plaintiff,**

v.

**Stephen ROUSSEAU, et al., Defendants.**

**Case No. 6:10–cv–448–Orl–28GJK.**

United States District Court, M.D. Florida, Orlando Division.

March 19, 2013.

Jacquelynne Jordan Regan, Richard S. Dellinger, Lowndes, Drosdick, Doster, Kantor & Reed, PA, Orlando, FL, for Plaintiff.

Sean M. Wagner, Sean M. Wagner, PA, Melbourne, FL, for Defendant, Stephen Rousseau.

Michael Rosario, Kissimmee, FL, pro se.

### ORDER

JOHN ANTOON II, District Judge.

At approximately 2:00 p.m. on September 29, 2009, Stephen Rousseau ("Rousseau") and Michael Rosario ("Rosario") (collectively "Defendants") were transporting prisoners to various detention facilities in the State of Florida. One of the passengers was Tommy Lee Benton ("Benton"). It was a hot day, and the prisoners, including Benton, complained about the lack of ventilation in the stainless steel compartment where they were seated. Rousseau pulled the van off of the highway and parked in an empty parking lot. Defendants then opened the door to the rear of the van, and Rosario pulled Benton out of the van and onto the ground, and they beat and kicked Benton. Benton has sued Defendants for damages under 42 U.S.C. § 1983 alleging they were acting under color of law and exerted excessive force.

The case proceeded to a non-jury trial. Upon consideration of the evidence and testimony presented, arguments of counsel, the following findings of fact and conclusions of law are issued in accordance with Federal Rule of Civil Procedure 52(a)(1) in support of the Court's determination that Benton has proved his case by a preponderance of the evidence and is entitled to recover from Defendants.

1. Benton was a pretrial detainee at the time of the incident giving rise to this action.

2. Rosario, also known as Michael Rosado, failed to file an answer after personal service was made upon him. Accordingly, the Clerk of Court entered default as to this defendant (Doc. No. 111).

## I. Factual Overview and Procedural History

Benton[1] filed this action against Rousseau and Rosario,[2] drivers for United States Prisoner Transport ("USPT"). USPT is a private company in the business of transporting prisoners throughout the State of Florida. Pursuant to 42 U.S.C. § 1983, Benton alleged that Defendants used excessive force against him in retaliation for his protected speech, deprived him of equal protection, and subjected him to cruel and unusual punishment. By Order previously entered, the Court dismissed Benton's equal protection and cruel and unusual punishment claims (Doc. Nos. 40 & 67), and the case proceeded to trial on the issues of whether Defendants retaliated by using excessive force against Benton for his complaints regarding the conditions of the transport vehicle.

## II. Trial Evidence and Findings

At trial, Benton offered his own testimony and that of three witnesses—Emmanuel Curry, Christopher Mohr, and James C. Wiley.[3] Additionally, Robert Downs, President of USPT, testified. Rousseau offered his own testimony in opposition. Having considered the parties' pleadings, the trial testimony, exhibits, closing arguments, and proposed findings of facts, the Court finds the following facts were proved by a preponderance of the evidence. These factual findings are based on Benton's corroborated testimony, which the Court finds credible, and exhibits received in evidence.[4]

3. Benton, Curry, Mohr, and Wiley each admitted to being a convicted felon.

4. Considering all the circumstances, including the factors juries are told to consider in weighing credibility, see Eleventh Circuit Pattern Jury Instructions (Civil), Basic Instruction 3, the Court finds that Benton's testimony is credible and Rousseau's is not.

Defendants picked up Benton from the Hernando County Jail at 7:05 a.m. on September 29, 2009 (Pl.'s Ex. 10). Defendants were transporting Benton to Broward County, Florida. As explained by Curry and as shown by a photograph introduced into evidence, Defendants used a transport vehicle that contained a passenger cab, a center compartment, and a rear compartment that was partitioned in the middle to form two separate compartments in which to hold prisoners (Pl's Ex. 1). The USPT Trip Log indicates that when Defendants arrived at the Hernando County Jail, the transport van held eleven prisoners (Pl.'s Ex. 10). Benton testified that there was no room for him to sit in the transport vehicle, but Rousseau ordered him to enter the vehicle. He was seated in the right prisoner compartment along with Curry and Mohr, closest to the doors at the back of the vehicle. Further, Benton was handcuffed, his legs were shackled and attached together by a six to eight-inch chain, and his handcuffs and shackles were secured to a waist chain.

Benton, Curry, Mohr, and Wiley testified that it was hot on September 29, 2009, and the inside of the passenger compartment was hot, smelly, and humid. All of the prisoners, including Benton, complained of the heat throughout the day.[5] At 1:23 p.m., the transport vehicle stopped in Osceola County to drop off a prisoner and allow the other inmates a restroom break. The ventilation system was not activated while the transport vehicle was turned off. Rousseau testified that Rosario would have activated the ventilation system promptly after they commenced driving because Rosario was driving the

vehicle at that time. However, upon being confronted with the USPT trip log, Rousseau admitted that he was mistaken as to who was driving the transport van. Rousseau stated that he "must have been" driving the vehicle upon leaving the Osceola County Jail.[6]

In contrast to Rousseau's testimony, Benton testified that Defendants failed to promptly reactivate the ventilation system in the prisoner compartments. When Benton requested reactivation of the ventilation system, Rosario stated, "You all motherfuckers need to learn to say please." Benton responded, "Is please constitutionally required for ventilation?" Rousseau testified that Benton's complaints escalated, and he began yelling and striking his hands and feet against the metal divider in the prisoner compartment. Benton testified that despite his complaints, he was not disruptive. Benton denied kicking or striking the interior of the transport vehicle, and Curry and Wiley corroborated this testimony. Curry explained that an inmate seated in the adjoining compartment was tapping on the metal partition, but at no point did the tapping increase to banging.

Rousseau admitted he could not see the prisoners from where he was seated but could only hear them. Rousseau stated on cross-examination that he actually was not certain whether Benton was responsible for the banging noises he heard. Additionally, Rousseau admitted that the incident report did not state that Defendants stopped the van due to loud banging noises originating from the prisoner compartment.[7] Due to the inconsistencies in Rous-

---

5. Rousseau admitted on cross-examination that the temperature in the van was "too hot" and that more ventilation should have been required for the vehicle.

6. Rousseau specifically testified that he did not believe he was driving at the time the

transport vehicle left Osceola County, but he admitted that the USPT Trip Log was accurate.

7. The incident report was not admitted into evidence.

seau's testimony, the Court credits Benton's testimony over Rousseau's testimony. Furthermore, it is difficult to image how Benton, shackled the way he was and seated on a six to eight-inch bench, could have banged or kicked the metal compartment divider in such a manner as to be disruptive.

Approximately twenty minutes after Benton's exchange with Rosario, the transport vehicle came to a stop in a parking lot of a strip mall. Although Rousseau initially testified that Rosario made the decision to pull over the transport vehicle because he could not drive while Benton was yelling and banging, Rousseau admitted on cross-examination that because he was driving, he made the decision to stop the transport vehicle. The Court concludes that Benton's complaints regarding the temperature of the prisoner compartment did not rise to the level of disruptive behavior that warranted an unscheduled stop of the transport vehicle.[8] Nevertheless, Defendants exited the vehicle, opened the door to the prisoner compartment, and without warning, Rosario grabbed Benton's shirt. Benton pulled back, and his shirt ripped. Rousseau instructed Rosario to stand back, and Rousseau sprayed pepper spray into the prisoner compartment. The pepper spray hit Benton's face and chest area, and he experienced a burning sensation.

Rousseau admitted using pepper spray but explained he used the pepper spray because Benton failed to comply with Rosario's commands to exit the vehicle. However, Benton, Curry, Mohr, and Wiley consistently testified that neither Defendant issued a verbal warning before Rosario grabbed Benton and Rosario pepper-sprayed Benton. The Court finds that Rousseau's testimony regarding this issue is not credible. Rousseau also testified that Benton slid back on the six to eight-inch seat to a reclining position, propped his left leg up on the vehicle wall, and hung his right foot near the door. It is difficult for the Court to imagine how Benton could have placed himself in this position when he was wearing leg irons and there were at least two other inmates in the small prisoner compartment. Accordingly, the Court finds Rousseau's testimony does not warrant belief.

Although Rousseau denies striking or kicking Benton, the Court credits Benton's testimony, which was corroborated by Curry, regarding this matter. Rosario grabbed Benton's hair, dragged Benton out of the vehicle, and threw him to the ground. Both Defendants punched Benton in the head and kicked him several times in the side, where a pre-existing, unhealed stab wound was visible. After Defendants finished hitting Benton, they placed a "black box"—a device that further limits a prisoner's range of motion—on his hands. Benton was loaded back on the van. Although Benton continued to complain about the temperature of the van, his complaints were not loud. No other prisoners complained after the incident because they were afraid Defendants would use excessive force against them.

Benton testified that during the drive to USPT headquarters in Melbourne, Florida, which took a total of two hours and twenty minutes, he sat with a shirt ripped down to his waist and his eyes closed because the pepper spray was running into his eyes.[9] Defendants did not offer Ben-

---

8. Downs testified regarding USPT polices and stated that an unscheduled vehicle stop due to disruptive behavior in an unsecure location, without local police backup, would be a violation of USPT policy.

9. The Court notes that it is curious that it took two hours and twenty minutes to drive approximately forty-eight miles to Melbourne, Florida.

ton any medical care, nor did they wash the pepper spray out of his eyes; although they did, however, offer him a bottle of water.[10] Benton was not able to wash the pepper spray from his face until he arrived in Broward County at approximately 9:10 p.m. From USPT headquarters, a new driver drove the remaining prisoners to South Florida.[11]

Benton has visible dark marks or scars on his cheeks that he testified were the result of the pepper spray. Additionally, Benton explained that he now suffers headaches from being punched in the head. Benton also testified that he has numbness on his side where he was kicked and that he did not experience such numbness prior to this incident. In addition, Benton also has suffered shame, humiliation, and a loss of dignity from being beaten by Defendants. Benton explained that being beaten by prison guards is akin to having a "mark" against you; it shows weakness, and other prisoners will attempt to take advantage of that weakness. Benton's t-shirt, which cost approximately $12.00, was also ripped. Defendants presented no evidence to the contrary, and the Court accepts Benton's testimony as credible.

### III. Conclusions of Law

Section 1983 provides a vehicle for bringing claims for constitutional violations committed under color of state law. To prevail, Benton must demonstrate both that Rousseau deprived him of a right secured under the United States Constitution or federal law and that the deprivation occurred under color of state law. *Arring-*

ton v. Cobb Cnty., 139 F.3d 865, 872 (11th Cir.1998). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." *Griffin v. City of Opa–Locka,* 261 F.3d 1295, 1303 (11th Cir.2001) (quotation omitted).

The issue of whether Rousseau acted under color of state law is not contested. The Court will therefore only address whether Rousseau deprived Benton of any constitutional rights.

### A. Retaliation

A prisoner can establish a First Amendment retaliation claim by demonstrating that a prison official retaliated against him for exercising his right to free speech. *O'Bryant v. Finch,* 637 F.3d 1207, 1212 (11th Cir.2011). Benton must demonstrate that (1) his speech was constitutionally protected; (2) he suffered adverse action such that the defendant's retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal connection between the retaliatory action and the protected speech. *Id.* An inmate is considered "to be exercising his First Amendment right of freedom of speech when he complains to prison administrators about conditions of his confinement." *Smith v. Mosley,* 532 F.3d 1270, 1276 (11th Cir. 2008) (citing *Farrow v. West,* 320 F.3d 1235, 1248 (11th Cir.2003)).

It is clear that Benton engaged in constitutionally protected speech because he complained about the conditions of his con-

10. Benton's hands were handcuffed, placed in a black box, and tied to his waist chain. It therefore would have been difficult, it not impossible, for Benton to wash the pepper spray out of his eyes using a bottle of water.

11. Rousseau testified that he recalls driving Benton to Broward County. However, the USPT Trip Log does not list him as a driver

during that trip. Additionally, the Court finds it is inconceivable that Rousseau would have continued on to Broward County for another twelve-hour shift after he had driven with Rosario from 12:00 p.m. on September 28, 2009, through approximately 4:20 p.m. on September 29, 2009—twenty-eight hours—without any breaks.

finement in the transport vehicle. It is also clear that Rousseau engaged in adverse or retaliatory conduct that would deter an ordinary person from engaging in such speech. After Benton continued to complain about the temperature of the transport vehicle in a non-disruptive manner, Rousseau stopped the transport vehicle and pepper-sprayed and beat Benton. The witnesses to this event—Curry, Mohr, and Wiley—testified that after the incident, they no longer complained about the conditions of the vehicle because they did not want to be beaten by Defendants. Thus, the other prisoners in the transport vehicle were deterred from complaining in the same manner.

 Once a plaintiff has met his burden of establishing the first two factors, the burden then shifts to the defendant to show that there is no causal connection between the retaliatory action and the protected speech. *Smith,* 532 F.3d at 1278. If a defendant can demonstrate that he would have taken the same action in the absence of the protected activity, he is entitled to prevail. *Id.* (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and *Thaddeus–X v. Blatter,* 175 F.3d 378, 399 (6th Cir.1999)). Rousseau cannot meet this burden. Rousseau stopped the transport vehicle a short time after Benton made his complaints regarding his conditions of confinement. Benton did not act disruptively, and therefore, the Court concludes that Benton's complaints were the motivating factor behind Rousseau's actions. The incident would not have occurred but for Benton's complaints regarding the conditions of his confinement. Thus, there is a causal connection between Rousseau's retaliatory action and Benton's protected speech.

Benton has demonstrated that Rousseau violated his First Amendment rights by retaliating against him for his use of protected speech. Accordingly, Benton prevails on this claim.

### B. Excessive Force

 "Claims involving the mistreatment of arrestees or pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause...." *Cottrell v. Caldwell,* 85 F.3d 1480, 1490 (11th Cir. 1996) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Such claims, however, are analyzed under the same standard. *Id.; Smith v. Vavoulis,* 373 Fed.Appx. 965, 966 (11th Cir.2010). To prevail on a claim of excessive force, a plaintiff must establish that the force was maliciously and sadistically applied for the purpose of causing harm. *Smith,* 373 Fed.Appx. at 966 (citing *Campbell v. Sikes,* 169 F.3d 1353, 1374 (11th Cir.1999)). To determine whether the force was applied maliciously and sadistically—a subjective inquiry—federal courts look to the following factors: (1) the extent of the injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of the staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them. *Id.* A plaintiff must also prove an objective component—that a requisite amount of force was used against him. *Id.* To establish a requisite amount of force, a plaintiff must suffer from more than a *de minimis* injury; however "a significant injury is not required to establish ... [a] violation." *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Johnson v. Breeden,* 280 F.3d 1308, 1321 (11th Cir.2002)).

Each of these factors weighs in Benton's favor. Regarding the extent of the injury factor, federal courts have held there is no "fixed minimum quantity of injury that a prisoner must prove that he suffered" in order to state an excessive force claim. *See Harris v. Whitehead*, No. 2:04cv485–MHT–, 2007 WL 2300964, at *6 (M.D. Ala. Aug. 8, 2007) (citing *Brooks v. Kyler*, 204 F.3d 102, 103 (3d Cir.2000)). "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (per curiam). Benton's injuries include headaches and facial scars. Benton also testified that he experiences numbness in his side, which did not occur until he was beaten and kicked. Benton's injuries, although perhaps not serious, amount to more than *de minimis* injuries. *See Skelly v. Okaloosa Cnty. Bd. of Cnty. Comm'rs*, 456 Fed.Appx. 845, 848 (11th Cir.2012) (holding that the plaintiff's injuries, which consisted of an abrasion to her eye and burns from the use of tasers, were not *de minimis* although they did not amount to serious injuries); *Harris v. Chapman*, 97 F.3d 499, 505–06 (11th Cir. 1996) (concluding the plaintiff's injuries, which consisted of exacerbation of a pre-existing back injury caused by the defendant's kicks, amounted to more than *de minimis* injuries).

Furthermore, the need for force was not high; Benton was not being disruptive as he complained about the temperature of the prisoner compartment. There was no need for Defendants to stop the transport vehicle, pepper-spray Benton, who's ability to move was severely constrained, and then beat and kick him. The Court concludes that the amount of force used on Benton was high considering that there was little to no need for the use of force, and Benton was extremely vulnerable.

*See Dobbins v. Giles*, 451 Fed.Appx. 849, 851 (11th Cir.2012) (concluding that there was no need for the defendant to punch and slap the wheel chair-bound plaintiff in the face for failing to promptly get out of bed for the cell shake-down).

Rousseau also made no effort to temper his use of force. Rousseau did not issue any warnings to Benton after stopping the van and opening the doors to the prisoner compartment. Instead, Rosario grabbed Benton's shirt, and Rousseau applied pepper spray. Rather than terminating the punishment or enforcement action at that juncture, Defendants proceeded to remove Benton—who was handcuffed and shackled—from the vehicle, slam his body onto the hot pavement, and beat and kick him. *See Skelly*, 456 Fed.Appx. at 848 (concluding that the defendants could have tempered their use of force instead of tasing a handcuffed and compliant pretrial detainee).

Additionally, there was no threat to Defendants or the other inmates; there is no evidence that Benton acted violently or that the other inmates felt unsafe. Benton has thus established that the use of force was applied maliciously or sadistically for the purpose of causing harm. *Cf. McReynolds v. Ala. Dep't of Youth Servs.*, 204 Fed.Appx. 819, 822 (11th Cir.2006) (holding that the complaint set forth sufficient allegations to allow the inference of malicious and sadistic intent where it alleged that the injured detainee was neither disruptive nor a threat to staff or other inmates, at least one defendant continued to strike the detainee after he was injured, and one defendant made statements indicating that he derived pleasure from assailing the detainee).

Consequently, with regard to the objective component of this claim, the evidence reflects that more than the requisite amount of force was used against Benton. Thus, an analysis of the subjective and

objective factors indicates that Rousseau used excessive force against Benton in violation of his Fourteenth Amendment rights. Benton therefore prevails on his second claim.

Because the Court finds in favor of Benton regarding both his constitutional claims, Rousseau's ore tenus motion for directed verdict, filed pursuant to Federal Rule of Civil Procedure 52(c) is denied.

### IV. Damages

#### A. Compensatory Damages

 "[C]ompensatory damages may be awarded based on physical pain and suffering caused by a defendant's use of excessive force, apart from any damages based on monetary loss." *Slicker v. Jackson*, 215 F.3d 1225, 1231 (11th Cir.2000). In other words, a federal district court may award compensatory damages based on actual injuries suffered, even if a plaintiff cannot present evidence of out-of-pocket loss or other monetary harms. *Id.* (citing *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) and *Atkins v. New York City*, 143 F.3d 100, 104 (2d Cir.1998)). Additionally, a plaintiff may also be "awarded compensatory damages based on demonstrated mental and emotional distress, impairment of reputation, and personal humiliation." *Slicker*, 215 F.3d at 1231 (citing *Wright v. Sheppard*, 919 F.2d 665, 669 (11th Cir.1990)). Pursuant to 42 U.S.C. § 1997e(e), in order to recover for mental or emotional injury suffered while in custody, a prisoner must demonstrate more than a *de minimis* physical injury. *Williams v. Brown*, 347 Fed.Appx. 429, 436 (11th Cir.2009).

The Court observed scarring on Benton's face that Benton credibly testified was the result of Rousseau's use of pepper spray. In addition, Benton explained that he now suffers from headaches and numbness in his side—conditions he did not experience prior to being punched and kicked by Defendants. The Court concludes that Benton has demonstrated physical pain and suffering as a result of Defendants' actions. Benton also suffered the loss of a $12.00 shirt.

Because Benton has established that he suffered more than *de minimis* injury, he is also entitled to damages for his emotional distress. Benton testified regarding the humiliation and emotional distress he suffered after the events on September 29, 2009. Although damages for emotional distress or mental anguish are "at best difficult to measure," the Court harbors no doubt that Benton suffered mental and emotional anguish as a result of Defendants' actions. *See Copley v. BAX Global, Inc.*, 97 F.Supp.2d 1164, 1171 (S.D.Fla. 2000). Having considered the above elements of compensatory damages, the Court concludes that Benton is entitled to $45,012.

#### B. Punitive Damages

 Punitive damages are a form of prospective relief under the Prison Litigation Reform Act of 1996. *See Johnson*, 280 F.3d at 1325. 18 U.S.C. § 3626(a)(1)(A) provides that federal courts shall not grant or approve punitive damages, "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *See also Johnson*, 280 F.3d at 1325. In other words, punitive damage awards must be "no larger than reasonably necessary to deter the kind of violations ... that occurred[,]" the awards imposed should be against "no more defendants than necessary to serve that deterrent function" and should be "the least intrusive way of doing so." *Johnson*, 280 F.3d at 1325. Further, a punitive damages award may be given even without a showing of actual loss by the plaintiff. *Harris*, 97 F.3d at 506.

Although Defendants are no longer employed at USPT, after the incident USPT did not investigate nor did it punish Defendants for their actions. The imposition of punitive damages in this case will deter Defendants from taking similar actions in the future. In the Court's view, the above standards for punitive damages are satisfied by an award of $15,000. The punitive damage award in the instant case is an appropriate amount to pay for the violation of Benton's constitutional rights. *See Hudson v. Singleton*, No. Civ.A. CV602–137, 2006 WL 839339, at *2 (S.D.Ga. Mar. 27, 2006). Accordingly, the Court finds Benton is entitled to punitive damages in the amount of $15,000 based on Defendants' violation of his First and Fourteenth Amendment rights.

### V. Motion for Default Judgment

■ Benton has filed a motion for entry of final default judgment as to Rosario (Doc. No. 129). Rosario was personally served on August 20, 2012 (Doc. No. 100). United States Magistrate Judge Kelly denied Rosario's motion to quash service of process—finding that personal service was properly made upon the defendant by the United States Marshal's Service—and counsel for Rosario had not provided any evidence to the contrary (Doc. No. 105).[12] The undersigned agrees that service of process was properly effectuated by personally serving Rosario, and Rosario failed to bring strong and convincing evidence to support a claim of insufficient service of process. *See Fru Veg Mktg., Inc. v. Vegfruitworld Corp.*, 896 F.Supp.2d 1175, 1181–82 (S.D.Fla.2012).

■ Rosario failed to file an answer or otherwise respond to the Third Amended Complaint. The Clerk entered default as to Rosario on January 2, 2013 (Doc. No. 111). *See Kelly v. Florida*, 233 Fed.Appx. 883, 885 (11th Cir.2007) (noting that the federal procedural rules require court clerks to enter a defendant's default "[w]hen service of process is properly effected, but the served party fails to respond in a timely manner"). Thus, the record establishes a sufficient basis for entry of default judgment against Rosario. *See Ohio Cas. Ins. Co. v. HDE, Inc.*, No. 6:12–cv–1153–Orl–28TBS, 2012 WL 6106410, at *2 (M.D.Fla. Nov. 19, 2012), *report and recommendation adopted by* 2012 WL 6106585 (M.D.Fla. Dec. 10, 2012).

By failing to answer a complaint, a default defendant is deemed "to admit the plaintiff's well-pleaded allegations of fact...." *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir.2005). Thus, by not filing an answer, Rosario has admitted he forcibly grabbed Benton by the shirt, ripped Benton's shirt, dragged Benton out of the transport vehicle by his hair, slammed Benton down on the pavement, and punched and kicked Benton. The Court has found that Rousseau's actions amounted to retaliation and excessive force in violation of Benton's First and Fourteenth Amendment rights. The Court concludes that Rosario, who equally participated in the incident, also violated Benton's constitutional rights. Accordingly, the only issue remaining is that of damages.

■ A plaintiff may establish the necessary amount of damages by affidavit,

12. Rosario's attorneys were hired by USPT's insurance company. Counsel alleged that they were not able to establish contact with Rosario and stated his whereabouts were unknown. Judge Kelly later allowed counsel to withdraw from representation after counsel provided the Court with the most recent residential address for Rosario that their search had revealed (Doc. No. 125). Orders sent by the Court to that address have been returned as undeliverable.

or a federal district court may "conduct hearings ... to determine the amount of damages." Fed.R.Civ.P. 55(b)(2); *see also Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 Fed.Appx. 908, 911–12 (11th Cir. 2011) (stating that Rule 55(b)(2) "leaves the decision to hold an evidentiary hearing [on the issue of damages] to the court's discretion"). Because the Court held a bench trial regarding Benton's claims, during which it heard evidence regarding the damages in this case, a separate evidentiary hearing regarding damages is not warranted. Rosario equally participated in the action that caused Benton's physical and emotional injuries; therefore, the Court awards Benton compensatory damages in the amount of $45,012 and punitive damages in the amount of $15,000 as to this Defendant.

## VI. Conclusion

In accordance with the foregoing, it is ORDERED AND ADJUDGED as follows:

1. Rousseau's Ore Tenus Motion for Directed Verdict (Doc. No. 132) is **DENIED.**

2. As set forth herein, Plaintiff Tommy Lee Benton prevails on his First Amendment retaliation claim and Fourteenth Amendment excessive force claim. Benton is awarded compensatory damages in the amount of $45,012 and punitive damages in the amount of $15,000 against each Defendant, for total damages of $60,012 as to each Defendant.

3. The Clerk shall enter judgment in favor of Plaintiff Tommy Lee Benton and against Defendant Rousseau in the amount of $60,012.

4. Benton's Motion for Default Judgment as to Rosario (Doc. No. 129) is **GRANTED.** The Clerk shall enter judgment by default in favor of Plaintiff Tommy Lee Benton and against Defendant Rosario in the amount of $60,012.

5. The Clerk shall close the case and terminate any pending motions.