Keith Dashaun **MITCHELL**, Plaintiff,

v.

Sergeant O.B. **PARKER** and Officer Aaron Dowling, Defendants.

CIVIL ACTION FILE NUMBER
1–16–cv–00253–TCB

United States District Court,
N.D. Georgia, Atlanta Division.

September 25, 2017

---

Mark Andrew Begnaud, Nathanael A. Horsley, Horsley Begnaud, LLC, Atlanta, GA, for Plaintiff.

Brenda Ann Raspberry, Laura K. Johnson, Nikisha L. McDonald, Elizabeth Louise Fite, Decatur, GA, for Defendants.

## ORDER

Timothy C. Batten, Sr., United States District Judge

This case comes before the Court on Sergeant O.B. Parker and Officer Aaron Dowling's motion for partial summary judgment on the claims filed against them by Plaintiff Keith Dashaun Mitchell [29–1]. Defendants also argue that partial summary judgment is warranted on nearly all the remaining claims stemming from the November 27, 2013 arrest of Mitchell at the Tanqueray Lounge in Decatur, Georgia.

### I. Background

The facts surrounding the arrest are disputed by the parties. Both Sgt. Parker and Officer Dowling were employees of the DeKalb County Police Department. At the time, Parker also worked as an off-duty security guard at the lounge. Mitchell had been a periodic customer of the lounge since it opened approximately twenty years ago. Non-party Stacie Friday was also a periodic customer of the lounge and was a witness to several of the relevant events.

On February 23, 2012, Parker and Mitchell had their first encounter at the lounge. Mitchell was engaged in a heated exchange with other customers in the lounge, including Friday. Parker intervened and told Mitchell to leave. Mitchell stated he was about to leave. Once outside the lounge, Parker and Mitchell had their own heated exchange, which resulted in Parker arresting Mitchell for disorderly

conduct and public intoxication. Parker testifies that during this incident, with the permission of the lounge manager, he gave Mitchell a criminal trespass warning and told him not to return to the lounge.

On April 14, 2012, Parker and Mitchell had another encounter at Echelon Bistro, where Parker was also working off-duty security. Another argument occurred, wherein Parker yelled, "Oh, am I reckless eyeballing you now?" and told Mitchell he could not enter Echelon Bistro. Mitchell left the establishment without being arrested.

On April 17, 2012, Mitchell filed a complaint against Parker with DeKalb County Police Internal Affairs alleging Parker had falsely arrested him in February and further harassed him during the Echelon Bistro incident.

Parker testifies that in early 2013, following Mitchell's ongoing ban from the Tanqueray Lounge, Friday requested that Mitchell be allowed back into the lounge. Parker refused the request, telling Friday, "[Mitchell] already made an Internal Affairs complaint on me, which Internal Affairs referred to my supervisor, it came down to what they call a line-level complaint." [29–3] at 78. Mitchell and Friday both testify that Parker's alleged warning and ban on February 23, 2012 never occurred. Friday asserts that her alleged conversations with Parker regarding Mitchell's ban from the lounge were also fabricated by Parker.

On November 27, 2013, Parker again saw Mitchell inside the lounge. Parker requested an officer be dispatched due to Mitchell's trespassing. Officer Dowling arrived and Parker informed him that there was a patron in the lounge trespassing who needed to leave. Parker and Dowling approached Mitchell, who was sitting at the bar, and Parker informed him that he was not supposed to be in the lounge. Mitchell refused to leave, and a physical altercation ensued among Mitchell, Parker, Dowling, and Deputy A. B. Malone, who was off-duty in the lounge and came to assist Parker and Dowling. Eventually, Mitchell was handcuffed, stood up, escorted outside, and placed in a patrol car.

On July 13, 2015, Mitchell's criminal case from February 2012 was dismissed. The dismissal stated that the investigation revealed Mitchell "may have had permission from one of the three owners of the establishment to continue his patronage of the business."

### A. Disputed Material Facts Asserted by Parker and Dowling

Parker's and Dowling's versions of the events are similar to each other. Parker testifies that during the prior incidents with Mitchell, Mitchell was belligerent and threatening, specifically making threats of violence and retaliation against Parker. Parker testifies that while he knew Friday, he did not have a substantial relationship with her and at no point had or expressed any romantic interest in her, nor did he have any personal ax to grind with Mitchell. Parker testifies that after banning Mitchell from Tanqueray Lounge in February 2012, Friday requested he be allowed to return to the lounge and after Parker denied this request Friday became angry and "cursed [him] out" in front of the lounge. [29–3] at 79.

Parker testifies that on November 27, 2013 he saw Mitchell in the Tanqueray Lounge for the first time since giving Mitchell the criminal trespass warning in February 2012. Parker then spoke with the lounge's manager and confirmed that Mitchell was not supposed to be in the lounge. After Dowling arrived, Dowling and Parker approached Mitchell and Parker told Mitchell he was not supposed to be in the lounge. Mitchell responded that he was not going anywhere. Parker

reached for Mitchell's beer bottle as a safety precaution, and a physical altercation ensued. Mitchell resisted arrest and refused to comply with the officers' verbal commands. Mitchell was eventually handcuffed, taken outside, and placed in a patrol car. Mitchell continued making threats and resisting the officers before, during, and after his arrest.

## B. Disputed Material Facts Asserted by Mitchell and Friday

Mitchell and Friday present a different version of these events. Friday alleges that she met Parker in 2008, when he began working at the Tanqueray Lounge. Shortly afterwards, Parker began making repeated romantic advances toward Friday that she consistently rebuffed. Since then, as Friday continued to frequent the lounge, Parker often became visibly upset when Friday spoke with other men. Around the same time, Friday met and became friends with Mitchell, and the two eventually began dating.

After the February 2012 arrest, Friday testified that Parker bragged to her about having arrested Mitchell, played her an audio recording of the arrest, and informed her that Mitchell was married and had children. In May or June 2012, Parker approached Friday in a restaurant and told her about the incident with Mitchell at the Echelon Bistro. Parker made a number of disparaging comments regarding Mitchell, including that Parker would make it his business to send Mitchell to prison if he did not shoot Mitchell first. Parker also told Friday about the internal affairs complaint Mitchell filed.

Friday denies ever speaking with Parker about allowing Mitchell back into the lounge after the criminal trespass warning. She also testifies that she saw Mitchell at the lounge at least thirty times between the summer of 2012 and the incident in November 2013. She testifies that Parker

was also at the lounge on nights she was with Mitchell more than fifteen times during that time frame. On those occasions, Parker glared or stared threateningly at Mitchell when Mitchell and Friday were together.

On November 27, 2013, Friday and Mitchell had been seated at the bar in the lounge for a few hours while Parker stared at them. After Donald Harris, an owner of the bar with whom Friday and Mitchell were friends, left for the night, Parker approached the two with Dowling and Malone. Parker told Mitchell he had to leave because he was trespassing. Mitchell responded that he was not trespassing and that he was welcome at the lounge by Harris.

Parker grabbed Mitchell's beer and slammed it onto the bar, then grabbed Mitchell's wrists and yanked Mitchell off the barstool. Parker forced Mitchell into a corner of the bar and slammed Mitchell to the ground while Parker and the other officers struck Mitchell multiple times in the body and legs.

Friday and Mitchell both testify that Mitchell did not resist after being handcuffed. While Mitchell was handcuffed, Parker rammed Mitchell's head into the floor and dropped his knee onto the side of Mitchell's head several times. After the officers picked Mitchell up, Parker gouged Mitchell in the eye and punched him in the face. Mitchell testifies that while handcuffed behind his back outside, Dowling lifted his arms over his head until he heard his shoulders pop. As a result of the entire incident, Mitchell suffered a black eye, a torn frenulum beneath his tongue, two separated shoulders, pinched nerves in his wrists, a bruised torso, and other injuries.

After Mitchell was arrested, Parker approached Friday inside the lounge and said, "I told you I was going to make his life a living hell. That's what he gets."

Friday testifies that she told Parker that Mitchell had done nothing wrong and Parker replied by asking why she would defend someone who had filed an internal affairs complaint against him, saying, "He could have got me in trouble; I could have lost my job." [35–2].

### C. Mitchell's Lawsuit

On January 11, 2016, Mitchell filed this action in the State Court of DeKalb County, Georgia alleging several causes of action: (1) § 1983 excessive force against all Defendants; (2) state law assault and battery against all Defendants; (3) § 1983 failure to intervene against Dowling and Malone; (4) § 1983 illegal seizure against all Defendants; (5) state law false imprisonment against all Defendants; (6) § 1983 malicious prosecution against Parker; and (7) § 1983 First Amendment retaliation against Parker. [1–1]. Defendants timely removed the case to this Court. [1].

Following discovery, Mitchell withdrew all claims against Malone and consented to his dismissal from this suit. Mitchell also withdrew counts four, five, six, and seven against Dowling.

The remaining claims are as follows: (1) § 1983 excessive force against Parker and Dowling; (2) state law assault and battery against Parker and Dowling; (3) § 1983 failure to intervene against Dowling; (4) § 1983 illegal seizure against Parker; (5) state law false imprisonment against Parker; (6) § 1983 malicious prosecution against Parker; and (7) § 1983 First Amendment retaliation against Parker.

On November 30, 2016, Defendants filed a motion for partial summary judgment [29] on qualified and official immunity grounds.

## II. Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437–38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must " 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox*,

*Inc.,* 64 F.3d 590, 593–94 (11th Cir. 1995) (quoting *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548).

### III. Analysis

#### A. Federal § 1983 Claims

Section 1983 creates no substantive rights. *See Baker v. McCollan,* 443 U.S. 137, 140 n.3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Rather, § 1983 provides a vehicle through which an individual may seek redress when his federally protected rights have been violated by an individual acting under color of state law. *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994).

To state a claim for relief under § 1983, a plaintiff must satisfy two elements. First, he must allege that an act or omission deprived him of a right, privilege, or immunity secured by the Constitution of the United States. *Hale v. Tallapoosa Cty.,* 50 F.3d 1579, 1582 (11th Cir. 1995). Second, he must allege that the act or omission was committed by a state actor or a person acting under color of state law. *Id.*

Mitchell presents various § 1983 claims: excessive force, failure to intervene, illegal seizure, malicious prosecution, and First Amendment retaliation. Each claim alleges a violation of a specific right under the Constitution, and each claim alleges that the act or omission was committed by a person acting under color of state law—Parker and/or Dowling.

Defendants, however, contend that Mitchell cannot maintain his § 1983 claims against them because they are entitled to qualified immunity in their individual capacities.

"Qualified immunity offers complete protection for individual public officials performing discretionary functions

'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Sherrod v. Johnson,* 667 F.3d 1359, 1363 (11th Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Still, "when a defendant moves for summary judgment based on the doctrine of qualified immunity, the court must view the facts in the light most favorable to the plaintiffs." *Hardin v. Hayes,* 957 F.2d 845, 848 (11th Cir. 1992).

To claim qualified immunity, a defendant must first show he was performing a discretionary function.[1] *Moreno v. Turner,* 572 Fed.Appx. 852, 855 (11th Cir. 2014). "Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply." *Edwards v. Shanley,* 666 F.3d 1289, 1294 (11th Cir. 2012) (quoting *Lewis v. City of W. Palm Beach,* 561 F.3d 1288, 1291 (11th Cir. 2009)).

A plaintiff demonstrates that qualified immunity does not apply by showing "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged violation." *Moreno,* 572 Fed.Appx. at 855. The "clearly established" requirement may be met in one of three ways: (1) showing that a "materially similar case" had already been decided; (2) showing that an accepted general principle should control the novel facts of the case with obvious clarity; or (3) showing that the conduct in question so obviously violated the Constitution that no prior case law is necessary. *Hope v. Pelzer,* 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Loftus v. Clark–Moore,* 690 F.3d 1200, 1204–05 (11th Cir. 2012).

1. There is no dispute that Defendants were acting within the scope of their discretionary authority when they encountered Mitchell at the lounge.

Mitchell asserts a variety of § 1983 claims against the two Defendants. Therefore, the Court will evaluate each claim individually in light of Defendants' assertion that they are entitled to qualified immunity for each allegation.

### 1. Section 1983 Excessive Force [2] Claim Against Dowling

Mitchell contends that qualified immunity is not appropriate on his excessive force claim against Dowling. Mitchell concedes that Dowling was acting within his discretionary authority when committing the alleged violation. Therefore, as mentioned above, Mitchell has the burden to demonstrate that Dowling is not entitled to qualified immunity by showing that (1) the force used was objectively unreasonable and therefore unconstitutional, and (2) the force used was contrary to and prohibited by clearly established law about which a reasonable law enforcement officer would have known at the time the alleged violation occurred. *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727.

 The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the right to be free from the use of excessive force in the course of an investigatory stop or other "seizure" of the person. *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In regards to the first prong, the "reasonableness" inquiry in an excessive force case is objective: the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him,

without consideration of his underlying intent or motivation. *Id.* at 397, 109 S.Ct. 1865. "A law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive." *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010).

 Dowling is correct that "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865)). However, this right is not without its limits. To balance the reasonableness of an officer's force, a court must evaluate three factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865. "In addition, other considerations include: '(1) the need for the application of force, (2) the relationship between the need and the amount of force used, [and] (3) the extent of the injury inflicted ....'" *Crenshaw v. Lister*, 556 F.3d 1283, 1290 (11th Cir. 2009) (quoting *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008)).[3]

 Mitchell refutes Dowling's qualified immunity claim by arguing that he

---

**2.** Defendants do not ask the Court to grant summary judgment on Mitchell's § 1983 excessive force claim against Parker. Therefore, the Court's evaluation is limited to Dowling's alleged excessive force.

**3.** Although this Circuit's test previously included a subjective prong examining whether the force was applied maliciously, *see, e.g., Leslie v. Ingram*, 786 F.2d 1533, 1536 (11th

Cir. 1986), this factor has been eliminated from the analysis by *Graham* and other cases establishing that the excessive force inquiry should be completely objective, therefore excluding consideration of the officer's intentions. *See Nolin v. Isbell*, 207 F.3d 1253, 1257 n.3 (11th Cir. 2000) (referring to subjective element of excessive force test as "invalidated").

was subject to excessive force in three ways: (1) Dowling struck him several times while taking him to the ground; (2) Dowling held him while Parker gouged his eye and punched him in the face; and (3) outside the lounge, Dowling ratcheted his arms up over his head with enough force to separate both of his shoulders. Mitchell contends that Eleventh Circuit case law supports the position that striking a suspect who is in handcuffs and is not actively resisting law enforcement officers is excessive force. *Hadley*, 526 F.3d at 1330; *Lee*, 284 F.3d at 1188; *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000).

Such a statement is accurate given that the Eleventh Circuit has stated that "*Graham* dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1197.

The facts in this case are disputed by the parties and Friday. However, the Court is not to weigh conflicting evidence, and must view the facts in the light most favorable to Mitchell. In doing so, it becomes apparent that a jury could find from the evidence that Dowling's use of force was excessive and unreasonable.

Viewed in the light most favorable to Mitchell, Parker snatched Mitchell out of his seat and pushed him into a corner where he was beaten by the three officers and handcuffed behind his back. Dowling testifies that he punched Mitchell multiple times in the ribs and ended up on top of Mitchell's back to handcuff him. After Mitchell was handcuffed and was not resisting, Dowling held Mitchell while Parker continued to punch him multiple times in the face and gouge him in the eye. Outside, Dowling lifted Mitchell's arms high enough behind his back to separate both his shoulders.

In *Hadley*, 526 F.3d at 1330, the Court held that a single punch in the stomach while the suspect was handcuffed and not struggling or resisting constituted an excessive use of force. Similarly, in *Lee*, 284 F.3d at 1198, the Court held that slamming the plaintiff's head onto the hood of a car constituted excessive force where the plaintiff was handcuffed, did not pose a threat to the officer, and was not a flight risk. The amount of force alleged against Mitchell is much greater than the single instances of force found excessive in *Hadley* and *Lee*.

Considering the totality of the circumstances, the severity of Mitchell's alleged crime—misdemeanor criminal trespassing—is also less severe than in *Hadley* or *Lee*, where qualified immunity was denied. In *Hadley* the plaintiff faced felony resisting arrest charges, and in *Lee*, felony charges for battery and resisting arrest. *Hadley*, 526 F.3d at 1324; *Lee*, 284 F.3d at 1192. Misdemeanor criminal trespass is also a less severe crime than many of the Eleventh Circuit cases Defendants cite for support. *See Rodriguez v. Farrell*, 280 F.3d 1341, 1344 (11th Cir. 2002) (cocaine possession); *Nolin v. Isbell*, 207 F.3d 1253, 1254–55 (11th Cir. 2000) (public fighting); *Jones v. City of Dothan*, 121 F.3d 1456, 1458 (11th Cir. 1997) (harassment by fleeing suspect).

The parties agree that Mitchell was seated at the bar with Friday when they approached and thus did not pose an immediate threat to the safety of the officers or others. Whether and when Mitchell was actively resisting arrest is a disputed question of material fact. As such, Dowling cannot prevail at the summary judgment stage, and the amount of force used by him could be found by a jury to be excessive and unreasonable.

Having concluded that Mitchell has made a sufficient showing of excessive

force, the Court must determine whether Dowling is entitled to qualified immunity on the ground that the law had not been clearly established at the time of the incident. As mentioned above, "the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and our own case law 'inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful.'" *Lee*, 284 F.3d at 1199 (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000)).

Incorporating the analysis above, a jury must resolve questions of material fact regarding the level of force, including whether Mitchell resisted arrest after he was handcuffed and what action Defendants took after he was handcuffed. As *Hadley* and *Lee* show, it is clearly established law in the Eleventh Circuit that striking a suspect who is in handcuffs and not actively resisting arrest constitutes excessive force. *Hadley*, 526 F.3d at 1330; *Lee*, 284 F.3d at 1199.

The facts alleged here compel the rejection of Dowling's assertion that this case is akin to those cases where the Eleventh Circuit has granted qualified immunity on the basis that the injury sustained by the plaintiff was de minimis. Unlike other opinions granting qualified immunity, this case involved infliction of severe force and injury after Mitchell's arrest had been fully accomplished and the danger vitiated. *See Rodriguez*, 280 F.3d at 1345 (injury occurred during handcuffing); *Nolin*, 207 F.3d at 1255–57 (plaintiff grabbed, thrown against van, and handcuffed before arrest); *Jones*, 121 F.3d at 1458, 1460–61 (plaintiff slammed against wall and searched as officers carried out arrest); *Gold v. City of Miami*, 121 F.3d 1442, 1446–47 (11th Cir. 1997) (minor injury caused solely by tight handcuffs); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1556, 1559–60 (11th Cir. 1993) (arrestee pushed against wall when continuing to speak despite being ordered by officer to stop talking). Questions of material fact remain as to whether Dowling repeatedly punched Mitchell, held him while Parker gouged his eye, and separated his shoulders after he was in custody. As a matter of law, these alleged injuries are not de minimis.

For the foregoing reasons, Dowling's motion for summary judgment on Mitchell's excessive force claim is denied.

## 2. Section 1983 Failure to Intervene Claim Against Dowling

Mitchell contends that Dowling violated his constitutional rights when he failed to intervene against Parker's alleged excessive force. According to Mitchell, Dowling is liable for his failure to take reasonable steps to protect Mitchell from Parker's excessive force. *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341–42 (11th Cir. 2007).

Dowling contends that there is an absence of evidence in the record to support this claim and therefore Dowling could not have violated a clearly established constitutional right and is entitled to qualified immunity.

For Dowling's nonfeasance to be actionable, there must be evidence from which a reasonable jury could find that he could have anticipated and then stopped Parker from committing the alleged excessive force violation. *Hadley*, 526 F.3d at 1331. In *Velazquez*, 484 F.3d at 1342, the Court found that for summary judgment purposes, the plaintiff's testimony that two officers were present while he was being beaten in handcuffs, coupled with the officers admitting to their presence, was sufficient for a reasonable jury to find that both officers administered excessive force or that one officer administered excessive force and the other failed to intervene. Here, there is more evidence than the inferences relied upon in *Velazquez*.

Dowling contends that there is no evidence showing that he could even see what Parker was doing, let alone have anticipated and stopped the alleged excessive force. This contention ignores the testimony of both Mitchell and Friday, who each contend that Dowling assisted and participated in the beating from the beginning, after Parker pulled Mitchell from his seat, and that Dowling held Mitchell while Parker continued to punch Mitchell and gouge his eye.

In her affidavit, Friday testified that "[Dowling] was holding [Mitchell] when Parker was gouging [Mitchell] in the eye and punching [Mitchell] in the face. That officer could easily have stopped Parker if he wanted—the officer was standing right there holding [Mitchell] while Parker was attacking [Mitchell]." [35–2] ¶ 51.

While Defendants dispute this evidence, a reasonable jury might not. A reasonable jury could find that Dowling could have anticipated and stopped Parker's ongoing attack. Likewise, the jury could find that Dowling could have stopped Parker from continuing to punch and gouge Mitchell's eye after Mitchell was in handcuffs by not holding Mitchell in place for Parker to beat. As discussed above, such conduct would violate a clearly established constitutional right. *See Velazquez*, 484 F.3d at 1341–42. As such, Dowling's alleged failure to intervene must be resolved by a jury.

### 3. Illegal Seizure Claim Against Parker

Parker moves for summary judgment on Mitchell's illegal seizure claim because at least arguable probable cause existed for Mitchell's arrest for criminal trespass. Parker bases this claim on disputed evidence that the criminal trespass warning was actually given and that Parker was working at the direction of Tanqueray Lounge's manager in removing Mitchell.

O.C.G.A. § 16–7–21(b)(2) defines criminal trespass as occurring when one

"knowingly and without authority . . . [r]emains upon the land or premises of another person . . . after receiving, prior to such entry, notice from the owner, rightful occupant, or, upon proper identification, an authorized representative of the owner or rightful occupant that such entry is forbidden . . . ." Here, it is disputed whether such notice was given at all and whether Parker fabricated the notice due to a personal vendetta against Mitchell.

 Arguable probable cause is "all that is required for qualified immunity to be applicable to an arresting officer." *Lee*, 284 F.3d at 1195. Such arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." However, "falsifying facts to establish probable cause is patently unconstitutional." *Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004). "[Q]ualified immunity will not shield an officer from liability for false statements that were *necessary* to the probable cause." *Jones v. Cannon*, 174 F.3d 1271, 1285 (11th Cir. 1999) (emphasis in original).

 Mitchell rests his illegal seizure claim on the assertion that Parker "was driven purely by [his] . . . vendetta against [Mitchell] and was totally unsupported by even arguable probable cause." [35] at 17. Mitchell testifies that he never received a criminal trespass warning and was never told he could not patronize the lounge. Instead, Mitchell was expressly welcomed by Harris, one of the owners of the lounge. In fact, Mitchell contends that because of his relationship with Harris, Parker intentionally waited three hours—until Harris left the lounge—before approaching Mitchell and arresting him. [35] at 19.

Mitchell contends that he placed Parker on notice that Harris had authorized his

presence when Parker approached him that night. Friday testified that "[Mitchell] explained that he was not criminal trespassing. [Mitchell] told Parker that nobody had ever told him he wasn't allowed to be at the Tanqueray Lounge and that Kia's father, Donald Harris, had told him that he was welcome at the Tanqueray Lounge any time." [35–2] ¶ 20. Mitchell thus contends that Parker was on notice that Harris had authorized Mitchell's presence.

Mitchell and Friday both testify that Parker saw Mitchell in the lounge numerous times between the date on which Parker claims to have given Mitchell a criminal trespass warning and November 27, 2013—the date of the incident. Mitchell contends that these facts undermine the assertion that Parker issued a criminal trespass warning because if he had done so, he would have removed Mitchell from the lounge on any one of the times he saw Mitchell there. Parker testifies that the night of the incident was the first time he had seen Mitchell in the lounge since he gave Mitchell the criminal trespassing warning. Friday's affidavit also disputes the veracity of Parker's testimony that he gave Mitchell a criminal trespass warning. She asserts that Parker's testimony that she asked for Mitchell to be allowed back into the lounge after the warning was fabricated.

If Parker fabricated the criminal trespass warning as alleged, the criminal trespass warning cannot provide Parker with probable cause or arguable probable cause. *Kingsland*, 382 F.3d at 1232. Defendants' brief asserts the following sequence of events: "Sgt. Parker reminded [the manager] that Plaintiff had been given a criminal trespass warrant in early 2012. [The manager] informed Sgt. Parker that Plaintiff was not supposed to be in [Tanqueray Lounge]." [29–1] at 25. Parker cannot rely on statements from the manager to manufacture arguable probable cause if Parker's

statements to the manager were knowingly false.

Viewed in the light most favorable to Mitchell, Parker has not shown that Mitchell was ever in fact banned from the lounge. Accordingly, summary judgment is inappropriate on the issue of whether Parker had arguable probable cause to arrest Mitchell.

### 4. Malicious Prosecution Claim Against Parker

Mitchell asserts a § 1983 claim against Parker for malicious prosecution in violation of the Fourth Amendment to the United States Constitution. The Eleventh Circuit "unequivocally has identified malicious prosecution to be a constitutional tort that is cognizable under § 1983." *Uboh v. Reno*, 141 F.3d 1000, 1002–03 (11th Cir. 1998).

 "To establish a federal malicious prosecution claim under § 1983, the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable *seizures* in addition to the elements of the common law tort of malicious prosecution." *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003) (emphasis in original). The common law elements in Georgia are (1) a criminal prosecution instituted or continued by the defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused. *Id.* at 881–82.

Mitchell asserts malicious prosecution claims based on the criminal trespass, obstruction, and terroristic threats charges against him. Parker seeks summary judgment, arguing that Mitchell's malicious prosecution claims fail due to the existence of arguable probable cause, lack of malice, and lack of damages.

Parker's argument regarding a lack of damages is untenable. Parker alleges on

all three claims that Mitchell could not have suffered damages because the cases were resolved in his favor. [29-1] at 29-31. However, resolution in the plaintiff's favor is the third element of a malicious prosecution claim. If resolution of the criminal case in the plaintiff's favor conclusively proved there were no damages (element four), there could never be a successful claim for malicious prosecution.

As discussed above and below, a reasonable jury could conclude that Parker acted with malice against Mitchell and lacked even arguable probable cause to arrest Mitchell for criminal trespassing. If Parker fabricated the criminal trespass warning as alleged, he cannot claim the criminal trespass warning provided him with probable cause or arguable probable cause. *Kingsland*, 382 F.3d at 1232.

■■■ Similarly, if the criminal trespassing charge was manufactured by Parker, then Parker was no longer acting lawfully in his actions. In Georgia, a person commits obstruction when he or she knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties. O.C.G.A. § 16-10-24(a). However, for purposes of obstruction, an officer is not lawfully discharging his duties when he "arrest[s] an individual without reasonable or probable cause." *Meadows v. State*, 303 Ga.App. 40, 692 S.E.2d 708, 710 (2010). If the jury credits Mitchell's version of events, Parker could be found to lack arguable probable cause for both the criminal trespassing and the obstruction charges.

Finally, regarding the charge of terroristic threats, the only statement by Mitchell that is uncontested is that while he was being arrested he told Parker he was going to "fuck his life up." [29-6] at 100-101. "A person commits the offense of a terroristic threat when he or she threatens to ... [c]ommit any crime of violence." O.C.G.A § 16-11-37. Viewed in the light most favorable to Mitchell, this statement standing alone is not specific or definite enough to constitute a threat of a crime of violence. Further, given the history of Mitchell and Parker, a reasonable jury could conclude that this statement was a reference to Mitchell filing another report with internal affairs, which Mitchell subsequently did. As such, this claim also must be resolved by the jury.

In the instant motion, both sides contest only whether the common law elements of malicious prosecution are met in this case. Though neither party addresses the predicate deprivation of liberty required in a § 1983 malicious prosecution claim, see *Kingsland*, 382 F.3d at 1235, this element seems to have neither been adequately alleged nor proven by Mitchell. Though Mitchell's complaint states that Parker "arrested and prosecuted" him, Mitchell fails to assert more than conclusory allegations and has presented no facts in support of a post-arrest seizure. "It is well-established that such conclusory allegations are insufficient to state a § 1983 claim for relief." *L.S.T., Inc. v. Crow,* 49 F.3d 679, 684 (11th Cir. 1995); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (conclusory allegations are not entitled to be presumed true).

■■■ In order to satisfy the seizure element, Mitchell bears the burden of proving that he was seized in relation to the prosecution, in violation of his constitutional rights. "In the case of a warrantless arrest, the judicial proceeding does not begin until the party is arraigned or indicted." *Kingsland,* 382 F.3d at 1235. "Thus, the plaintiff's arrest cannot serve as the predicate deprivation of liberty because it occurred prior to the time of arraignment, and was not one that arose from malicious prosecution as opposed to false arrest." *Id.*

Here, Mitchell has not pled or proven any factual allegations regarding a post-

arrest seizure or deprivation of liberty. Instead, he appears to assert the distinct tort of false arrest, which provides a constitutional remedy for a warrantless arrest without probable cause. *See id.*, 382 F.3d at 1226. Even viewing the facts in the light most favorable to Mitchell, there is an absence of evidence to support Mitchell's claims of malicious prosecution. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548.

Accordingly, the parties are instructed to brief this issue within 14 days of this Order. Pursuant to Federal Rule of Civil Procedure 56(f)(3), the Court will then determine whether summary judgment is appropriate on Mitchell's malicious prosecution claims.

**5. Retaliation Claim Against Parker**

▮ Mitchell next alleges, pursuant to § 1983, that Parker subjected him to retaliation in violation of the First Amendment. "The First Amendment right of free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Bethel v. Town of Loxley*, 221 Fed.Appx. 812, 813 (11th Cir. 2006). To state a claim for retaliation under the First Amendment, a plaintiff must demonstrate that (1) he engaged in protected speech; (2) the defendant's conduct adversely affected the protected speech; and (3) a causal connection exists between the speech and the defendant's retaliatory actions. *Castle v. Appalachian Tech. Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011); *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

▮ In regards to the first two prongs, Parker does not contend that Mitchell fails to demonstrate that he engaged in protected speech by filing an internal affairs complaint against Parker or that Parker's conduct adversely affected the protected speech. Such arguments would be unavailing, as the First Amendment "protects a significant amount of verbal criticism and

challenge directed at police officers.... The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Gibbons v. McBride*, 124 F.Supp.3d 1342, 1373 (S.D. Ga. 2015) (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1139 (11th Cir. 2007)); *see also Abella v. Simon*, 522 Fed. Appx. 872, 874 (11th Cir. 2013) (finding the plaintiff alleged facts sufficient to establish three police officers unlawfully retaliated after he filed grievances against each of them and engaged in other protected activity).

Instead, Parker argues that Mitchell failed to establish the third prong:

> The record is devoid of any evidence to show that Sgt. Parker was somehow motivated by Plaintiff's internal affairs complaint to savagely beat Plaintiff .... There is also no admissible evidence in the record that Sgt. Parker repeatedly 'complained' to Ms. Friday about the internal affairs complaint.

[29–1] at 31.

▮ To establish a causal connection, Mitchell must allege that his protected conduct was a "motivating factor" behind Parker's alleged misconduct. *Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013); *Mosley*, 532 F.3d at 1278. "Plaintiff must identify a sequence of events from which a retaliatory motive can be inferred, notwithstanding other non-retaliatory motives the defendant may harbor." *Eisenberg v. City of Miami Beach*, 1 F.Supp.3d 1327, 1344 (S.D. Fla. 2014) (citation omitted). To resolve the subjective motivation issue, courts rely on the burden-shifting formula set forth in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). *Mosley*, 532 F.3d at 1278. Under the *Mt. Healthy* formula,

[o]nce the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail ... on summary judgment.

*Id.* (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999).

In conducting this analysis, courts also consider the temporal proximity between a plaintiff's exercise of free speech and the adverse action in gauging a causal connection. *See Bumpus v. Watts*, 448 Fed. Appx. 3, 7 (11th Cir. 2011); *Akins v. Fulton Cty.*, 420 F.3d 1293, 1305 (11th Cir. 2005). "[I]f there is a significant time gap between the protected expression and the adverse action, the plaintiff must offer additional evidence to demonstrate a causal connection, such as a pattern of antagonism...." *Gibbons*, 124 F.Supp.3d at 1375–76. (quoting *Jones v. Suburban Propane, Inc.*, 577 Fed.Appx. 951, 955 (11th Cir. 2014)).

Here, while Mitchell acknowledges that there was a year-and-a-half gap between filing the internal affairs complaint and the November 27, 2013 incident at Tanqueray Lounge, he also cites to other evidence demonstrating that there is a genuine issue of material fact as to whether Parker's alleged actions were committed in retaliation for Mitchell's filing of the internal affairs complaint against Parker.

For instance, Mitchell points to the affidavit testimony of Friday that Parker approached her at a restaurant and told her that "he was going to make it his business to send Keith to prison if he didn't shoot Keith first [and] that Keith had filed an internal affairs complaint against him." [35–2] ¶¶ 21–22. Furthermore, in testifying about another man who was banned from the lounge but whom Parker later allowed back into the lounge, Parker referred to the internal affairs complaint in discussing the differences between that man and Mitchell:

Q. What made this [situation with Plaintiff] different [from the situation with the other gentleman who was allowed back into the lounge]?

A. For the simple fact that not only—I arrested the first guy just like I arrested Keith. The guy never made threats toward me. So, this guy made threats toward me. He goes to Internal Affairs and said that he feels, he feels, that in the future I will find little or no reason to arrest or shoot him, which where he got that from I don't know.

[29–3] at 83.

In response, Defendants have failed to demonstrate that Parker would have taken the same action in the absence of Mitchell filing the internal affairs complaint. A reasonable juror could view Parker's testimony as demonstrating that had Mitchell not filed the complaint, Parker would not have committed the alleged torts.

Thus, if a jury finds Mitchell and the testimony he cites credible, a reasonable juror could find that Parker retaliated against him for filing the internal affairs complaint.

### 6. State Law Claims

Finally, this action also includes Mitchell's state law claims against Parker and Dowling in their personal capacities. However, in accordance with Georgia law, Defendants contend that official immunity bars any claim against them as public officers.

In contrast to qualified immunity, official immunity "protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority ...." *Teston v. Collins*, 217 Ga.App. 829, 459 S.E.2d 452, 454

(1995). However, official immunity is not without its limits. Public agents, such as Parker and Dowling, can be sued "if they (1) negligently perform a ministerial duty, or (2) act with actual malice or actual intent to cause injury while performing a discretionary function." *Id.* (citing Ga. Const. of 1983, art. I, sec. II, para. IX (d)).

■■■ "[I]n the context of official immunity, actual malice requires a deliberate intention to do wrong and denotes express malice or malice in fact." *Selvy v. Morrison*, 292 Ga.App. 702, 665 S.E.2d 401, 404–05 (2008) (quoting *Adams v. Hazelwood*, 271 Ga. 414, 520 S.E.2d 896 (1999)). Actual malice does not include the reckless disregard for the rights and safety of others. *Selvy*, 665 S.E.2d at 405. "A deliberate intention to do wrong such as to constitute the actual malice necessary to overcome official immunity must be the intent to cause the harm suffered by the plaintiffs." *Id.* To prove actual malice, a plaintiff must do more than show that the defendant acted with ill will towards him; rather, the plaintiff must show that the defendant acted with a deliberate intent to commit a wrongful act. *Adams*, 520 S.E.2d at 898.

The Georgia Supreme Court has defined the phrase "actual intent to cause injury" to mean "an actual intent to cause harm to the plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury. This definition of intent contains aspects of malice, perhaps a wicked or evil motive." *Kidd v. Coates*, 271 Ga. 33, 518 S.E.2d 124, 125 (1999) (citations and punctuation omitted). In *Kidd*, the court held that if officers used force intentionally and without justification, they acted "with the tortious 'actual intent to cause injury.'" *Id.*

■■■ Incorporating the analysis above, Mitchell has presented sufficient evidence to create a question of fact as to whether Parker and Dowling acted with actual malice or a deliberate intent to cause injury. In Parker's case, Mitchell has presented

testimony that Parker harbored a personal vendetta to do him harm for more than a year, confirming to Friday on the night of Mitchell's November arrest that he had followed through on this wrongful intention. A reasonable jury could find that Parker acted with a deliberate intention to commit the wrongful acts in question.

As to Dowling, there is no evidence that he was privy to, or involved in, Parker's alleged vendetta. However, there is testimony in the record from Mitchell and Friday that after Mitchell was handcuffed and was no longer resisting, Dowling held Mitchell while Parker gouged his eye and Dowling lifted Mitchell's arms up behind his back to a height sufficient to separate Mitchell's shoulders. At this stage in the proceedings, this evidence is sufficient to create a genuine question of material fact as to whether these actions constitute an actual intent to cause injury.

Defendants' reliance on *Selvy* is misplaced. In *Selvy*, the police officers allegedly caused the harm *in the process of* apprehending the plaintiff. *Selvy*, 665 S.E.2d at 405–06. There was no allegation of intentional harm to the plaintiff in *Selvy* after she was apprehended and not resisting arrest. *Id.* at 403. As discussed at length above, there are genuine issues of fact regarding whether Mitchell continued to resist arrest after being placed in handcuffs and whether Parker and Dowling jointly or separately injured him intentionally. Such post-arrest injuries have been found sufficient for a reasonable jury to conclude police officers acted with actual malice or an actual intent to cause injury. *See Tabb v. Veazey*, No. 1:05-cv-1642, 2007 WL 951763, at *7–8 (N.D. Ga. Mar. 28, 2007) (finding evidence of actual malice where officer hit plaintiff on the face with butt of a handgun when plaintiff was no longer resisting); *Hill v. Mull*, No. 5:04-cv-329, 2006 WL 3022280, at *14 (M.D. Ga. Oct. 23, 2006) (finding issue of material

fact existed as to actual malice where officer charged and threw plaintiff to the ground while handcuffed, kneed plaintiff in the back, and watched as another officer stood on plaintiff's feet); *Reed v. City of Lavonia,* 390 F.Supp.2d 1347, 1369–70 (M.D. Ga. 2005) (finding issue of fact as to actual malice where officer attacked plaintiff with a baton despite plaintiff's lack of resistance and continued to beat plaintiff when he was on the ground); *Jackson v. City of Albany,* 49 F.Supp.2d 1374, 1381 (M.D. Ga. 1998) (finding issue of material fact existed where officer began hitting plaintiff with his nightstick after plaintiff was subdued). Here, too, a reasonable jury could find evidence to support the conclusion that both Parker and Mitchell acted with actual malice or an actual intent to cause injury after Mitchell had been arrested.

## IV. Conclusion

For the foregoing reasons, Defendants' partial motion for summary judgment [29] is denied. As discussed *supra*, the parties have 14 days to brief the issue raised by the Court regarding Mitchell's claims of malicious prosecution.

IT IS SO ORDERED this 25th day of September, 2017.